# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

**Albert H. Schmidt**, **Jr.,**                                       Civ. No. 10-4899 (MJD/AJB)

        Plaintiff,

                                      **REPORT AND RECOMMENDATION**

**v.**

**Michael J. Astrue,**

**Commissioner of Social Security**,

        Defendant.

_____

Sean M. Quinn, Esq., 1200 Alworth Building, 306 West Superior Street, Duluth, MN 55802-1800, for Plaintiff.

Lonnie F. Bryan, Asst. United States Attorney, 600 United States Courthouse, 300 South 4th Street, Minneapolis, MN 55415, for the Commissioner.
_____

ARTHUR J. BOYLAN, United States Chief Magistrate Judge

The matter is before this Court, United States Chief Magistrate Judge Arthur J. Boylan, for a report and recommendation to the District Court on the parties' cross-motions for summary judgment.  <u>See</u> 28 U.S.C. § 636(b)(1) and Local Rule 72.1.  This Court has jurisdiction under 42 U.S.C. § 405(g).  Based on the reasoning set forth below, this Court recommends that Plaintiff's motion for summary judgment [Docket No. 7] be denied and Defendant's motion for summary judgment [Docket No. 13] be granted.

I.      FACTUAL AND PROCEDURAL BACKGROUND

A.      Procedural History

Plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") on December 16, 2004[1] and again on May 8, 2006, alleging disability beginning December 22, 2003.  (Tr. 126-31, 133-40.)[2]  Plaintiff alleged disability from a lower back injury, herniated disk, and arthritis of the spine and neck.  (Tr. 216.)  His applications were denied initially and upon reconsideration.  (Tr. 76-78, 87-92.)  Plaintiff timely requested a hearing before an administrative law judge, and the hearing was held on May 6, 2008, before Administrative Law ("ALJ") George Gaffaney.  (Tr. 93, 21-59.)  The ALJ issued an unfavorable decision on September 18, 2008.  (Tr. 8-20.)  On October 22, 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  See 20 C.F.R. §§ 404.981, 416.1481.  On December 16, 2010, Plaintiff sought review from this Court. The parties thereafter filed cross-motions for summary judgment.

B.      Factual Background

Plaintiff was born on January 11, 1959, and was 44-years-old on the alleged disability onset date, December 22, 2003.  (Tr. 133.)  At the time of the hearing, Plaintiff was single, and he and lived with a friend and her daughter.  (Tr. 33.)  He has a tenth grade

---

[1]      The December 16, 2004 applications were denied in a final and binding determination.  (Tr. 11).

[2]      The Court will cite the Administrative Record in this matter, Docket No. 6, as "Tr."

education and special training as a commercial icemaker technician.  (Tr. 221-22.)  Plaintiff

has past relevant work as a maintenance worker and maintenance mechanic.  (Tr. 250.)

Plaintiff quit working on December 22, 2003, after a work injury and issues with his worker's

compensation claim led to his dismissal.  (T. 216.)

On July 26, 2003, Plaintiff went to Perreault Chiropractic and reported that he hurt

his lower back lifting a refrigerator at work two days earlier.  (Tr. 495.)  Since then, Plaintiff

was having trouble standing, sitting and getting in and out of his car.  (Id.)  He tried using

ice and anti-inflammatories without improvement.  (Id.)

Plaintiff started treating at Gateway Family Health Clinic on September 10, 2003,

when he needed a refill of Lisinopril to treat his hypertension.  (Tr. 265-66.)  Plaintiff was

noted to be obese but making good progress with weight loss, and he was a heavy smoker

and alcohol user.  (Tr. 265.)

Plaintiff had an MRI of his lumbar spine on October 6, 2003, indicating "multilevel

lumbar disc degeneration . . . with moderate degenerative changes at each level from L4-5

through L2-3, mild degenerative changes at L1-2, and mild to moderate thoracolumbar

Scheuermann's-like changes."  (Tr. 252.)  Several days after the MRI, Plaintiff saw Dr.

Daryll Dykes at Twin Cities Spine Center for a consultation.  (Tr. 255-56.)  Plaintiff

described having 60% low back pain and 40% left leg pain since July 24, 2003, when he

hurt himself delivering a freezer for an appliance company.  (Tr. 255.)  His pain gradually

worsened.  (Id.)  On examination, Plaintiff was 69 inches tall and weighed 259 pounds.

(Id.)  He had a well-preserved range of flexion and extension, and full range of motion of

the hip, knee and ankle on the right.  (Id.)  On the left leg, he had some limited range of motion in the left knee, with tenderness but no instability.  (Id.)  Plaintiff's strength in the lower extremities was 5/5 and sensation and reflexes were intact.  (Id.)  Straight leg raise test was negative bilaterally.  (Id.)  Dr. Dykes diagnosed multilevel disc degeneration and flare of low back pain, with left knee pain unrelated to his spine.  (Tr. 255-56.)  Dr. Dykes recommended physical therapy and anti-inflammatory medication with work restrictions against lifting heavy appliances on a repetitive basis.  (Tr. 256.)  On October 20, 2003, Dr. Roger Perreault, Plaintiff's chiropractor, returned Plaintiff to work for two hours per day, with a ten pound lifting restriction and need to alternate positions. (Tr. 470.)

Dr. Dykes referred Plaintiff to Pine Medical Center Physical Therapy, where Plaintiff was evaluated on November 10, 2003.  (Tr. 641-42.)  Plaintiff was noted to have overall decreased functional strength, deconditioning, and poor body mechanic and postural awareness.  (Id.)  Physical therapy was ordered for three times a week for four weeks.  (Tr. 642.)  Plaintiff only attended three sessions.  (Tr. 643.)

The record contains an unsigned assessment of Plaintiff's July 2003 work injury that is dated December 1, 2003.  (Tr. 463.)  The assessment is presumably by Dr. Perreault, because the work restrictions are consistent with a Report of Work Ability Dr. Perreault completed in December 2003.  (Tr. 463, 460.)  Dr. Perreault restricted Plaintiff to working four hours a day, occasionally lifting 26-35 pounds and frequently lifting 11-25 pounds, and Plaintiff would need to alternate between standing and sitting.  (Tr. 463.)  Dr. Perreault anticipated increasing Plaintiff's work hours in the near future.  (Id.)

Plaintiff underwent a Physical Work Performance Evaluation at NovaCare Rehabilitation on January 5, 2004. (Tr. 259.) The evaluation report indicates that Plaintiff's self-limiting behavior influenced the test results. (Tr. 259.) The report provides, "[b]ased on this evaluation, the client is incapable of sustaining the Light level of work for an 8-hour day. Able to complete the evaluation." (Id.) On January 7, 2004, Dr. Perreault completed a Report of Work Ability and indicated that Plaintiff needed to follow the work restrictions in the performance report provided by NovaCare Rehabilitation. (Tr. 454.) On March 1, 2004, Dr. Perreault opined that Plaintiff reached maximum medical improvement and had a 10.5% disability of the whole body. (Tr. 453.)

Dr. Perreault completed another assessment of Plaintiff's work injury on September 4, 2004. (Tr. 486.) Plaintiff reported low back pain and left leg pain at a level three out of five. (Id.) Standing or sitting in excess of 30-40 minutes significantly increased his pain. (Id.) Plaintiff also had difficulty going up and down stairs and bending. (Id.) Plaintiff was on work restrictions of six hours per day with limited bending, squatting and lifting. (Id.) Several months later, on January 5, 2005, Dr. Perreault wrote a letter on Plaintiff's behalf recommending total disability. (Tr. 268.) Dr. Perreault stated that Plaintiff suffered repetitive lower back injuries resulting in diffuse lumbar spine marked degeneration and disc disease, and that work involving lumbar flexion, bending and lifting would lead to further degeneration and significantly higher degrees of pain. (Id.)

Dr. Cliff Phibbs, a state agency reviewing physician, completed a Physical Residual Functional Capacity Assessment regarding Plaintiff at the request of the Social Security Administration ("SSA") on January 24, 2005. (Tr. 287-94.) Dr. Phibbs opined Plaintiff

would have the residual functional capacity ("RFC") to occasionally lift and carry fifty pounds; frequently lift and carry twenty-five pounds; stand and/or walk six hours in an eight hour day; sit six hours in an eight hour day; limited use of foot controls; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; and occasionally stoop and crouch. (Tr. 288-89.)  He also opined Plaintiff should avoid concentrated exposure to hazards.  (Tr. 291.)

Plaintiff received chiropractic treatment for back and leg pain between January 2004 and May 12, 2006.  (Tr. 305-336.)  After treatment, Dr. Perreault referred Plaintiff for an MRI of his lumbar spine, which was performed on May 22, 2006.  (Tr. 337-38.)  The MRI showed degenerative disc disease with diffuse bulging of the L1-2 through the L5-S1 and narrowing of the neuroforamina bilaterally at L2-3, L3-4, L4-5 and L5-S1.  (Id.)

Dr. Charles Grant, a state agency physician, reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity Assessment regarding Plaintiff at the request of the SSA on May 24, 2006.  (Tr. 342-49.)  Dr. Grant opined Plaintiff had the RFC to lift and carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk six hours in an eight hour day; sit six hours in an eight hour day, unlimited use of hand or foot pedals, never climb ladders, ropes or scaffolds; and occasionally climb ramps/stairs, stoop and crouch. (Tr. 343-44.)  Dr. Dan Larson reviewed the records and affirmed Dr. Grant's opinion on August 10, 2006.  (Tr. 364-66.)

On June 1, 2006, Dr. James Benzie at Gateway Clinic treated Plaintiff's low back pain with a prednisone burst, and he prescribed Neurontin.  (Tr. 608-09.)  Two weeks later,

Dr. Benzie noted that Plaintiff had radicular symptoms, and his pain had not responded to medications.  (Tr. 606.)  Dr. Benzie referred Plaintiff to neurosurgery and to pulmonology for evaluation of sleep apnea.  (Tr. 607.)  Dr. Benzie also encouraged Plaintiff to quit smoking.  (Id.)

Plaintiff underwent a consultation with Dr. Terry Hood at Millennium Neurosurgery on June 22, 2006.  (Tr. 354-55.)  Plaintiff rated his low back and right leg pain ten out of ten in severity.  (Tr. 354.)  Plaintiff complained of parasthesias, weakness in the right leg and a burning sensation in the right foot.  (Id.)  Only rest improved his symptoms.  (Id.)  In a review of systems, Plaintiff also reported symptoms of night sweats, dizziness, weakness, fatigue, mood swings, shortness of breath and cough.  (Id.)

On examination, Plaintiff weighed 290 pounds; straight leg raise test was negative bilaterally; motor strength and sensory examinations were normal; deep tendon reflexes were absent bilaterally; and his gait was antalgic, but Plaintiff could heel and toe walk without evidence of weakness.  (Tr. 354.)  Dr. Hood stated, "[m]y impression is the patient has a right leg radiculopathy, possibly L4, which is not explained by his recent MRI."  (Tr. 355.)  He recommended a lumbar myelogram, CT scan, and EMG of the right leg.  (Id.)

The EMG was done on June 26, and suggested mild, early peroneal palsy, but an L5-S1 radiculopathy could not be excluded; nevertheless, the findings were very mild.  (Tr. 357-58.)  The lumbar myelogram and CT scan were also conducted that day, and indicated:

> 1. Diffuse enlargement of the majority of the nerve roots within the cauda equina, of uncertain significance.  Considerations

7

> would include hypertrophic polyneuritis, granulomatous disease such as sarcoid, and possibly lymphoma. . . .
>
> 2. Multi-level degenerative changes. Multi-focal central disk bulging is present without degenerative central canal stenosis. There is a right foraminal disk herniation at L3-4, which appears to be compressing the right L3 ganglion, possibly a source of right-sided radicular symptoms. If the patient has a right L3 radicular pain pattern, further evaluation with a selective nerve root block may be helpful in confirmation of diagnosis.

(Tr. 360.) A diagnostic lumbar right L3 nerve root block was conducted on July 12, and Plaintiff reported preinjection pain at level three out of ten and postinjection pain at one out of ten. (Tr. 356.)

Dr. Xiaoming Dong at Minneapolis Clinic of Neurology saw Plaintiff on July 31, 2006, and Plaintiff reported increasing back pain the last several months, with radicular pain down the right leg and intermittent numbness in the right foot. (Tr. 529.) His only comfortable position was lying down. (Id.) Neurological examination was normal. (Tr. 530.) Dr. Dong agreed with Dr. Hood's assessment that Plaintiff's most likely had right-sided L3-4 radiculopathy. (Tr. 530.) He discontinued Neurontin and started Plaintiff on Lyrica. (Id.) Dr. Dong also referred Plaintiff for physical therapy and recommended a second lumbar puncture. (Tr. 530, 532.)

Plaintiff followed up with Dr. Benzie on August 11, 2006, for treatment of his low back pain. (Tr. 604-05.) Dr. Benzie prescribed Vicodin, Flexeril and Lyrica for pain. (Tr. 605.) Dr. Benzie referred Plaintiff to Dr. Stephen Haines at University of Minnesota Medical Center, Fairview for a neurosurgery consultation on October 25, 2006. (Tr. 537-38.) On

examination, Plaintiff's strength, sensation and reflexes were intact. (Tr. 537.) Plaintiff did not have a combination of historical, examination and imaging findings showing specific areas of abnormality to explain his pattern of pain; therefore, Dr. Haines did not recommend surgical intervention. (Id.) Dr. Haines recommended weight loss, a conditioning program, and a "strong physical medicine rehabilitation program." (Id.)

Plaintiff had x-rays of his pelvis, right hip, lumbar spine and right knee on January 3, 2007. (Tr. 680.) He had moderate degenerative changes in the right hip and mild degenerative changes in the left hip. (Id.) Degenerative changes were noted at multiple levels of his lumbar spine with mild disc space narrowing and endplate spurs. (Id.) There were mild degenerative changes of his right knee and a small joint effusion. (Id.) D r . Bridget Dewey referred Plaintiff to Dr. Eric Rudd in neurosurgery at Duluth Clinic for evaluation on January 8, 2007. (Tr. 668.) Dr. Rudd extensively reviewed Plaintiff's history since a 1998 low back injury. (Tr. 668-69.) During his review of systems, Plaintiff reported symptoms of dizzy spells, watery eyes, decreased hearing, earaches, ringing in the ears, nosebleeds, nasal congestion, stiff neck, chronic cough and wheezing, shortness of breath with exertion, ankle swelling, indigestion, loss of endurance, abdominal pain, constipation, diarrhea, pain, numbness, difficulty with balance, skin problems, cold and heat intolerance, jitteriness, fatigue, insomnia, depression and irritability. (Tr. 669.)

Plaintiff's low back pain with radiation down to the right leg was at a level of seven or eight out of ten. (Tr. 669.) Plaintiff also had moderate right groin pain and right knee pain. (Id.) Dr. Rudd assessed moderate severity multilevel lumbar degenerative disc disease that would account for Plaintiff's ten year history of episodic low back pain. (Tr.

670.)  Additionally, Dr. Rudd assessed osteoarthritis of the right hip, patellofemoral pain in the right knee, Morton's neuroma[3] of the foot, and morbid obesity with pronounced deconditioning compounding Plaintiff's impairments.  (Id.)  Dr. Rudd ordered x-rays of Plaintiff's lumbosacral spine and right hip and knee.  (Id.)  Dr. Rudd stated, "I am more concerned by the risk of his sedentary lifestyle/unemployment than any risk incurred in the course of return to work."  (Id.)

Plaintiff followed up with Dr. Rudd on January 18, 2007.  (Tr. 665-66.)  Dr. Rudd reviewed Plaintiff's x-rays, which showed moderate osteoarthritis of the right hip joint and moderate degenerative disc disease at multiple levels of the spine, but none of the degenerative changes were severe.  (Tr. 666.)  In addition, Dr. Rudd diagnosed right knee patellofemoral pain related to lateral tracking and Morton's neuroma of both feet.  (Id.)  Dr. Rudd did not advocate spine surgery because he was not convinced Plaintiff's leg pain was radicular.  (Id.)  Instead, he recommended general conditioning and weight loss and referred Plaintiff to physical medicine and rehabilitation.  (Id.)  Dr. Rudd also referred Plaintiff to orthopedics for consideration of his hip, knee and foot conditions.  (Id.)

Plaintiff was evaluated by Dr. Janus Butcher in Orthopedics at Duluth Clinic on January 26, 2007.  (Tr. 663.)  Plaintiff's symptoms included right low back pain radiating to the right hip and pain in the knee.  (Id.)  Plaintiff's pain was nearly constant but varied

---

[3]     Morton's neuroma is pain of a severe, throbbing, or stabbing character in an interdigital nerve, usually the anastomotic branch between the medial and lateral plantar nerves.  *Stedman's Medical Dictionary* 1206 (Lippincott Williams & Wilkins 27th ed 2000).  Plantar relates to the sole of the foot. Id. at 1392.

in intensity.  (Id.)  Dr. Butcher's assessment, after examining Plaintiff and reviewing his x-rays, was SI dysfunction with trochanteric bursitis; chronic lumbosacral dysfunction with probable stenosis related to degenerative joint disease; and IT band friction syndrome of the knee.  (Tr. 664.)  Dr. Butcher recommended a trial of prednisone and epidural and facet joint injections.  (Id.)

In January 2007, Plaintiff was evaluated at Mercy Hospital Physical Therapy Center to treat back, hip and knee pain.  (Tr. 558-63.)  Plaintiff expressed fear about walking on ice, and it was recommended that he use a cane.  (Tr. 562-63.)  In February 2007, Plaintiff reported some improvement with a cortisone injection in his right hip and knee.  (Tr. 564.)  Plaintiff also reported that physical therapy helped, but then he would overdo it because he liked to clean.  (Tr. 565.)  On February 13, Plaintiff reported he had been up on a ladder and cleaning the top of cupboards.  (Tr. 566.)  Physical therapy was discontinued when Plaintiff missed the next two appointments.  (Tr. 567.)

Plaintiff saw Dr. Janus Butcher for recheck of his right hip pain and right knee pain on February 20, 2007.  (Tr. 661.)  Plaintiff reported the cortisone injection in his right hip worked very well, and his low back pain had also improved somewhat.  (Id.)  Dr. Butcher assessed trochanteric bursitis and knee synovitis.  (Id.)  She recommended referral to physical medicine and rehabilitation for ongoing treatment of low back pain.  (Id.)  Plaintiff saw Dr. Rudd on February 20, 2007.  (Tr. 659.)  Plaintiff's low back pain was currently at a level two or three out of ten.  (Id.)  Dr. Rudd's assessment included moderate lumbar disk disease without radiculopathy; moderate right hip osteoarthritis, improved by injection; moderate right knee patellofemoral pain, improved by injection; Morton's neuroma; and

morbid obesity compounding all of the above.  (Id.)  Dr. Rudd recommended emphasis on general conditioning, weight loss and ultimately, work-hardening.  (Tr. 660.)

Plaintiff was evaluated by Dr. Laura Gregg in rheumatology at Duluth Clinic on March 3, 2007.  (Tr. 657-58.)  On physical examination, Dr. Gregg noted Plaintiff had trouble sitting still for long because of his back.  (Tr. 657.)  Plaintiff had positive straight leg raise on the right and limited right hip range of motion.  (Tr. 658.)  Dr. Gregg reviewed Plaintiff's X-rays and MRI of his spine.  (Id.)  Her impression was lumbar spondylosis, which could be treated with physical therapy and injections, and right hip degenerative arthritis, moderate to severe, which may require surgery in the future but could be helped with weight loss in the meantime.  (Id.)  Plaintiff's blood work was negative for inflammatory arthritis.  (Tr. 684.)

Plaintiff was referred back to the Mercy Hospital's physical therapy program on March 23, 2007, after injuring his left knee in January while doing maintenance work at Minnesota Program Development, Inc.  (Tr. 573.)  Plaintiff rated his average knee pain at level five out of ten.  (Id.)  He was using a brace, taking Lortab for sleep, and taking Naproxen during the day.  (Id.)  He would be off work until April 17.  (Id.)  After starting therapy, Plaintiff went back to work for a six hour day in the middle of April and had a difficult time tolerating leg pain.  (Tr. 578.)  On May 1, 2007, Plaintiff reported decreased swelling in his leg, and he continued to use a leg brace at work.  (Tr. 580.)  A week later, he was doing well at work and no longer using the leg brace.  (Tr. 581.)  Plaintiff improved again the following week and believed he would go back to full-time work the following week.  (Tr. 583.)

On July 3, 2007, Plaintiff reported to Dr. Kenneth Etterman at Gateway Clinic, that he had a significant increase in back and leg pain with no significant incident causing the exacerbation. (Tr. 596.) Plaintiff had Vicodin at home but did not use it much, because he did not like to take medications. (Id.) On examination, Plaintiff was significantly obese and barely able to get on the examination table. (Id.) He had significant discomfort with palpation of the right side of the lumbar spine and right hip, and decreased range of motion of the right hip. (Id.) Dr. Etterman prescribed Naprosyn for regular use and Percocet as needed. (Tr. 597.)

Plaintiff returned to Dr. Butcher at Duluth Clinic for treatment of right hip, bilateral knee and low back pain on July 10, 2007. (Tr. 655.) Dr. Butcher had given Plaintiff a corticosteroid injection in February, which provided relief for a month or two. (Id.) Plaintiff had constant pain in the hip and was almost immobile. (Id.) Dr. Butcher reviewed x-rays of Plaintiff's right hip, which indicated severe hip arthritis. (Id., 676.) Dr. Butcher recommended a hip injection to sort out the symptoms of back and hip pain and recommended a consultation for arthroplasty. (Tr. 655.)

A month later, Plaintiff reported that he had complete resolution of hip pain from the injection, but now his back pain was worsening. (Tr. 654.) Dr. Butcher referred Plaintiff for an epidural steroid injection, which was performed by Dr. Bridget Dewey. (Tr. 637.) The injection was done at the L4-5 level on August 30, 2007, and Plaintiff reported no change in his back or leg pain after the injection. (Id.)

13

On September 30, 2007, Plaintiff had x-rays of his left shoulder and CT scans of his brain and cervical spine after falling eight feet and losing consciousness. (Tr. 646-49.) The tests were negative, although the CT scan of his cervical spine showed hypertrophic degenerative changes with slight loss of joint space at C4-5. (Tr. 648-49.) Plaintiff went to the emergency room on October 13, 2007, because his back pain had been increasing since his fall. (Tr. 705.) He had been taking aspirin intermittently for pain. (Id.) Plaintiff was having difficulty walking, feeling like his hip was going to give out. (Id.) CT scans of the hips and lumbar spine showed degenerative changes but no fracture, and Plaintiff was prescribed Ultram for pain. (Id.)

Plaintiff saw Dr. Butcher for severe right hip pain on November 1, 2007. (Tr. 713.) Dr. Butcher referred Plaintiff for a hip injection and for consultation about total hip replacement. (Id.) Two weeks later, Nurse Gary Anderson prescribed a duragesic patch for Plaintiff's hip pain. (Tr. 592.)

Dr. Butcher referred Plaintiff to Dr. Michael Gibbons in Orthopedics for evaluation of right hip pain. (Tr. 711.) On December 18, 2007, Plaintiff's pain was worse with walking, and he was using a cane but not taking any medication. (Id.) Plaintiff had a right hip x-ray that day, which showed 100% loss of joint space. (Tr. 712, 672.) Dr. Gibbons recommended total hip arthroplasty. (Tr. 712.)

Plaintiff saw Dr. Butcher on February 5, 2008, for a painful, swelling right knee. (Tr. 710.) An x-ray of Plaintiff's knee showed a large calcification, and Dr. Butcher ordered an MRI. (Id.) The MRI showed a complete ACL tear, degenerative changes and mild

14

persistent inflammatory type change.  (Tr. 714.)  Plaintiff also had pulmonary function tests

that month, and Dr. Dewey noted the findings were consistent with moderate obstructive

pulmonary disease that was not reversible.  (Tr. 724.)

On April 1, 2008, Dr. Butcher wrote a letter to Plaintiff's counsel regarding his

medical condition.  (Tr. 754-55.)  Dr. Butcher supported Plaintiff's disability claim, and

stated that he had chronic low back pain with radiation into the leg due to spinal stenosis,

severe right hip osteoarthritis, bilateral knee pain with complete ACL tear on the right, and

complicating factors of high blood pressure, gout, Morton's neuroma, and morbid obesity.

(Tr. 754.)  Dr. Butcher noted Plaintiff was scheduled for right hip arthroplasty on April 9, and

she opined he met Listing 1.02, because he had difficulty with his hip for one year and

would have several months after surgery where he could not ambulate effectively.  (Id.)

Dr. Butcher also opined that Plaintiff equaled Listing 1.04 for spinal disorders due to his

lumbar stenosis.  (Id.)  She opined that the combination of his back, hip and knee

conditions would cause significant absenteeism due to pain level and difficulty performing

work tasks.  (Id.)

## C.    The Administrative Hearing

Plaintiff testified as follows at the hearing before the ALJ.  Plaintiff uses a cane due

to right hip and knee pain, and he had scheduled hip surgery.  (Tr. 24.)  Plaintiff's last job

was as an appliance repairer, installer and delivery person.  (Tr. 29.)  He lost the job in

December 2003 over issues with his worker's compensation claim.  (Tr. 30.)  At the time

of the hearing, Plaintiff lived with a friend and her daughter.  (Tr. 33.)

15

Plaintiff could not work because he had difficulty walking due to low back and right hip pain.  (Tr. 33-34.)  His back pain was constant, but it varied in intensity.  (Tr. 34-35.)  Plaintiff was unable to carry laundry baskets up and down stairs.  (Tr. 35.)  He was scheduled for hip replacement, and after he recovered from that, he would have knee surgery for a calcium deposit and torn ACL.  (Tr. 36.)  Plaintiff quit taking a number of medications due to lack of effectiveness or side effects, and he was not presently taking anything for pain.  (Tr. 37.)  He had been on Vicodin for a long time.  (Tr. 38.)

Plaintiff could stand for about ten minutes before his back would get sore.  (Tr. 39.)  He could walk about 150 feet with a cane.  (Id.)  He could walk up a few steps several times a day.  (Id.)  Plaintiff was uncomfortable sitting more than a half hour.  (Tr. 40.)  His high blood pressure and pain made him irritable.  (Tr. 41.)

Plaintiff could do some household chores such as laundry and making dinner, but he needed some help.  (Tr. 41-42.)  Plaintiff had difficulty losing weight, because he was inactive due to pain.  (Tr. 42.)  He only slept a couple hours because he woke up in pain.  (Id.)  On a good day, Plaintiff's pain level was five on a scale of one to ten.  (Tr. 43.)  On a bad day, he stayed in bed.  (Id.)  He had a good day a couple times a week, if he was careful about his activities.  (Tr. 44.)  For example, riding in the car more than an hour hurt his back.  (Id.)  On a good day, he could walk around a store for 30 to 45 minutes.  (Id.)  Cold damp weather exacerbated his pain.  (Tr. 45.)

Plaintiff lost his license due to DUI in 2005, and still drank five or six drinks daily. (Tr. 45-46.)  He reduced his smoking to a half pack a day in preparation for surgery.  (Tr. 46.)

Edward Utities testified at the hearing as a vocational expert ("VE").  (Tr. 49.)  The ALJ posed a hypothetical question to the VE about the type of work a person of Plaintiff's age, education, work history and impairments could perform.   In the first hypothetical question, the ALJ restricted the individual to lifting 50 pounds occasionally and 25 frequently, sitting and standing six hours each in an eight hour day, walking 300 feet, with additional limitations of no ladder climbing, and occasionally doing the following:  stair climbing, balancing, stooping, kneeling, crouching and crawling and occasional exposure to extremes of cold, humidity and wetness.  (Tr. 53-54.)  The VE testified such a person could not perform Plaintiff's past relevant work.  (Tr. 54.)  However, he testified such a person could perform other work including hand packager, found in the Dictionary of Occupational Titles ("DOT") under Code 920.587-018 and production helper, DOT Code 528.686-070.  (Id.)

The ALJ's second hypothetical question assumed a person capable of a light exertional level with the same non-exertional limitations and impairments as in the first hypothetical.  (Tr. 55.)  The VE identified wrapping and packing jobs consistent with the hypothetical question including: bander and cellophaner, DOT 920.685-014; wrapping machine operator, DOT 920.685-030; and poly packer and heat sealer, DOT 920.685-038, and there were 30 or 40 types of similar wrapping and packing jobs.  (Id.)

For a third hypothetical question, the ALJ limited lifting to ten pounds occasionally and five frequently, standing for two hours in an eight hour day, sitting six hours in an eight hour day, slight positional change after 30 minutes, and the same nonexertional restrictions as in the first two hypothetical questions.  (Tr. 56.)  The VE testified such a person could perform unskilled bench work at a sedentary level and gave examples of final assembler, DOT 713.687-018; fishing reel assembler, DOT 732.684-062; and lamp shade assembler, DOT 739.684-094.  (Id.)  If the ALJ added the limitation of unable to sustain an eight hour workday to the last hypothetical question, the VE testified the hypothetical individual could not perform any job on a full-time competitive basis.  (Tr. 57.)

### D.    The ALJ's Decision

On September 18, 2008, the ALJ issued his decision denying Plaintiff's applications for disability insurance benefits and supplemental security income.  (Tr. 10-24.)  The ALJ followed the five-step sequential evaluation set forth in the agency's regulations.  See 20 C.F.R. §§ 404.1520, 416.920.  The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ("RFC") to perform his or her relevant past work;" and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the ALJ "to prove that there

18

are other jobs in the national economy that the claimant can perform." Fines v. Apfel, 149 F.3d 893, 894-95 (8th Cir. 1998).

At the first step of the evaluation process, the ALJ determined that the claimant had not engaged in substantial gainful activity since December 22, 2003, the alleged onset date. (Tr. 13.)  At the second step of the process, the ALJ found that Plaintiff had  severe impairments of degenerative disc disease, lumbar spondylosis, right hip osteoarthritis, COPD, obesity, and right knee pain.  (Id.)  At the third step of the evaluation, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 16.)

At the fourth step of the evaluation process, the ALJ determined that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), lifting and carrying twenty pounds occasionally and ten pounds frequently; standing and/or sitting six hours of an eight hour day; walking 300 feet; occasionally climbing stairs, balancing, stooping, kneeling, crouching, crawling and occasional work in areas of humidity, wetness and cold extremes, but never climb ladders. (Tr. 16.)  The ALJ determined that Plaintiff could not perform his past relevant work.  (Id.)

At the fifth step of the evaluation process, the ALJ concluded there were other jobs existing in significant numbers in the national economy that Plaintiff could perform.  (Tr. 18.) Relying on the testimony of the VE, the ALJ determined that Plaintiff could perform the jobs of wrap/packaging bander and cellophaner, wrapping machine operator, and poly

packer/heat sealer.  (Tr. 19.)  The ALJ concluded that Plaintiff was not under a disability, as defined in the Social Security Act, from December 22, 2003 through the date of the decision.  (Id.)

## II.    DISCUSSION

### A.    Standard of Review

Review by this Court is limited to a determination of whether a decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Davidson v. Astrue, 578 F.3d 838, 841 (8th Cir. 2009).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Brace v. Astrue, 578 F.3d 882, 884 (8th Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation omitted)).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  Id.

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.)  Instead, the Court must consider

"the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability benefits. See 20 C.F.R. §§ 404.1512(a);416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated he or she can not perform past work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial gainful activity.  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).

### B.    Analysis

Plaintiff raised two arguments in support of his motion for summary judgment: 1) substantial evidence does not support the ALJ's finding that Plaintiff did not meet or equal a listed impairment; and 2) substantial evidence does not support the ALJ's finding that Plaintiff is capable of performing other work existing in significant numbers in the national economy.  Although Plaintiff stated his second argument as falling under the fifth step of the evaluation concerning his ability to perform work other than his past relevant work, his real challenge appears to be to the ALJ's RFC finding, based on the ALJ's credibility analysis and failure to follow Social Security Ruling 02-1p in considering obesity.

### 1.    Listing 1.02

The listing of impairments in the social security regulations describe, for each of the major body systems, impairments that are considered severe enough to prevent an individual from performing gainful activity, regardless of age, education or work experience.

21

20 C.F.R. §§ 404.1525, 416.925.   The claimant has the burden of proving he meets a listing; and he must meet all of the specified medical criteria.   *Conyer v. Astrue*, No. 5:07CV00158 BD, 2009 WL 2524553 at *3 (E.D. Ark. Aug. 17, 2009) (citations omitted). Dr. Butcher opined that Plaintiff met Listing 1.02, because he was scheduled for total hip replacement; he had difficulty with his hip for one year; and there would be a recovery period of several months after his surgery where he could not ambulate effectively.   (Tr. 754.)   The ALJ rejected Dr. Butcher's opinion because Dr. Butcher did not adequately explain how the listing was met.   (Tr. 16).

Listing 1.02 provides:

> *Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, body destruction, or ankylosis of the affected joint(s).  With:
>
> A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> or
>
> B.  Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

Section 1.00B2b defines inability to ambulate effectively.  "Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the

functioning of both upper extremities."  Examples of ineffective ambulation include inability to walk without the use of a walker, two crutches or two canes, inability to walk a block at a reasonable pace on rough or uneven surfaces, inability to carry out routine ambulatory activities such as shopping, and inability to climb a few steps at a reasonable pace with the use of a single hand rail.

On December 18, 2007, an x-ray of Plaintiff's right hip showed that he had 100% loss of joint space.  (Tr. 672.)  Plaintiff used a cane in one hand but there is nothing in the record to establish that he meets the definition of ineffective ambulation.  When Plaintiff completed a function report on December 24, 2004, he was not using any assistive device for walking.  (Tr. 209.)  On July 31, 2006, Plaintiff's gait was normal, and he could perform tandem toe and heel walking.  (Tr. 530.)  In January 2007, Plaintiff's physical therapist recommended that he use a cane, because Plaintiff said he was afraid of walking on ice. (Tr. 562-63.)  Then, Plaintiff wore a leg brace for a few months when he hurt his knee working part-time but weaned himself off the brace as of May 8, 2007.  (Tr. 573-81.) Plaintiff completed gait and balance activities in physical therapy on May 18, 2007, without complaints of leg pain or loss of balance.  (Tr. 582.)  Plaintiff could walk up and down stairs, walked with a good gait pattern, and picked up sticks in his yard.  (Tr. 583.)  Plaintiff felt he was ready to go back to work full-time as of May 21, 2007.  (Tr. 584.)  When Plaintiff complained of increased back, leg and hip pain in July 2007, to the point where he was almost immobile, neither Dr. Etterman nor Dr. Butcher noted Plaintiff to be using a cane or limping, and neither physician recommended use of a cane.  (Tr. 596, 655.)  Plaintiff then had complete resolution of his hip pain from an injection.  (Tr. 654.)  When Plaintiff was

23

again evaluated for back and hip pain in October 2007, his gait was painful but not giving out.  (Tr. 705.)  Plaintiff was not noted to be using a cane for assistance nor was a cane prescribed.  (Id.)

On December 18, 2007, Plaintiff reported to Dr. Gibbons that he had been using a cane for six weeks, but he was not taking anything for his hip pain.  (Tr. 711.)  At that point, an x-ray of Plaintiff's hip showed 100% loss of joint space, and Dr. Gibbons recommended hip replacement.  (Tr. 712.)  In February 2008, Dr. Butcher gave Plaintiff a leg brace for right knee pain.  (Tr. 710.)  Plaintiff was scheduled for hip replacement on April 9, 2008. (Tr. 754.)

Dr. Butcher opined Plaintiff would be unable to effectively ambulate for several months after hip surgery.  This would not meet the twelve month durational requirement for disability, because Plaintiff effectively ambulated using a single cane beginning in November 2007, as described above, and his surgery was scheduled for April 2008.  See 20 C.F.R. §§ 404.1505(a), 416.905(a) (durational requirement for disability is that disability can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months.)  Plaintiff's recovery from surgery and ability to ambulate effectively would not be expected to last more than several months after surgery.

## 2.    Listing 1.04

Dr. Butcher opined that Plaintiff equaled Listing 1.04 for spinal disorders due to his lumbar stenosis.  (Tr. 754.)  Plaintiff contends the ALJ did not explain why he rejected Dr. Butcher's opinion of medical equivalence.  However, the ALJ rejected Dr. Butcher's opinion

because Dr. Butcher did not explain his opinion, and the ALJ did not find persuasive evidence of compromise of a nerve root in the spine.  (Tr. 16.)

Medical equivalence can be found when the claimant has an impairment described in Appendix 1 but does not exhibit one or more of the required findings of the listing or has all of the required findings, but one or more of the findings is not as severe as specified in the listing.  20 C.F.R. §§ 404.1526(b)(1)(A and B), 416.926(b)(1)(A and B).  In such cases, the ALJ will find the claimant's impairment medically equivalent to the listing if the claimant has "other findings related to the impairment that are at least of equal medical significance to the required criteria."   20 C.F.R. §§ 404.1526(b)(1)(B)(ii), 416.926(b)(1)(B)(ii).

When the claimant has a combination of impairments, no one of which meets a listing, the ALJ will compare the findings to closely analogous listings to determine if the related impairments are at least of equal medical significance to those of a listed impairment.   20 C.F.R. §§ 404.1526(b)(2), 416.926(b)(2).   In determining medical equivalence, the ALJ considers "all medical evidence in your case record about your impairment(s) and its effects on you that is relevant to this finding" but does not consider age, education and work experience.  20 C.F.R. §§ 404.1526(c), 416.926(c).  The ALJ also considers the opinion of one or more medical consultants designated by the Commissioner.  Id.

Listing 1.04 provides:

> *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in

compromise of a nerve root (including the cauda equina) or the spinal cord.  With:

A.   Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

. . .

C.  Lumbar spinal stenosis resulting in pseudoclaudication,[4] established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

First, the Court notes, under Listing 1.04C, there is no mention of pseudoclaudication in the medical records, Plaintiff's chronic pain complaints were radicular in nature, his lower extremity motor strength was intact, and he was able to ambulate effectively, as defined in the regulations.  Therefore, the record does not support Plaintiff equaling Listing 1.04C.

Second, the ALJ correctly noted that there was no persuasive evidence of nerve root compression in Plaintiff' spine under Listing 1.04A.   After many evaluations for back pain, on October 25, 2006, Plaintiff was referred to a neurosurgeon, Dr. Haines, who opined that Plaintiff did not have a combination of historical, examination and imaging findings showing

---

[4]   Pseudoclaudication are painful cramps that are not caused by peripheral artery disease but rather by spinal, neurologic, or orthopedic disorders, such as spinal stenosis, diabetic neuropathy, or arthritis.  *Mosby's Medical, Nursing & Allied Health Dictionary* 1341 (5th ed. 1998).

specific areas of abnormality to explain his pattern of pain. (Tr. 537.) Dr. Haines'

statement is supported by the record because there is no conclusive evidence of nerve root

impingement, and sensory and reflex examinations were described as normal or intact. (Tr.

255, 530, 537.)[5]  The findings from Plaintiff's EMG were very mild. (Tr. 357-58.)

Plaintiff underwent another neurosurgical evaluation, this time with Dr. Eric Rudd on

January 8, 2007. (Tr. 670.) Dr. Rudd extensively reviewed Plaintiff's history, examined

Plaintiff, and ordered x-rays. (Id.) Dr. Rudd stated, "I am more concerned by the risk of his

sedentary lifestyle/unemployment than any risk incurred in the course of return to work."

(Id.) Two requirements of Listing 1.04A were missing, nerve root impingement and motor

loss accompanied by sensory or reflex loss. The record does not indicate how Plaintiff

otherwise medically equaled the requirements of Listing 1.04A or 1.04C,[6] and Dr. Butcher

did not provide an explanation. The ALJ, therefore, properly rejected Dr. Butcher's opinion.

See Casey v. Astrue, 503 F.3d 687, 694 (8th Cir. 2007) (ALJ properly rejected treating

physician's conclusory opinion).

Plaintiff's argument that his combination of impairments equals a listed impairment

is also unavailing. Dr. Butcher stated that Plaintiff's combination of his back, hip and knee

conditions would cause significant absenteeism due to pain level and difficulty performing

work tasks. (Id.) Neither Dr. Butcher nor Plaintiff explain how this statement corresponds

---

[5]     There was only one occasion where Plaintiff's deep tendon reflexes were
        absent. (Tr. 354.)

[6]     Listing 1.04B requires spinal arachnoiditis, which is not found in Plaintiff's
        medical records. 20 C.F.R. § 404, Subpart P, Appendix 1, § 1.04B.

to medical equivalence of the specific requirements of an analogous listed impairment. The ALJ did not err in rejecting Dr. Butcher's conclusory opinion of medical equivalence.

### 3.   RFC Determination

Plaintiff contends the ALJ rejected his subjective complaints without analysis, other than criticizing him for his weight and smoking and drinking habits. Plaintiff asserts his low back, hip, and knee impairments, combined with obesity, hypertension, Morton's neuroma, and COPD preclude his employment. Plaintiff argues the ALJ did not discuss his physical performance evaluation, which resulted in an RFC for light work on less than a full-time basis.

### a.   Obesity

Social Security Ruling 02-1p provides that the SSA will consider obesity in determining whether the claimant has a medically determinable impairment that is severe, whether the claimant's impairments meet or equal a listed impairment, and whether the claimant's impairments prevent him from performing past relevant work or other work that exists in significant numbers in the national economy. 2002 WL 34686281 (S.S.A. Sept. 12, 2002). The ruling provides that the severity or functional effects of obesity combined with other impairments will be evaluated based on the information in the case record. Id.

Here, the ALJ found Plaintiff to have a severe impairment of obesity. (Tr. 13.) The ALJ noted that Dr. Rudd opined Plaintiff's obesity and deconditioning compounded his degenerative disc disease and lumbar stenosis. (Tr. 17.) The ALJ also noted that Dr. Dewey attributed Plaintiff's dyspnea with exertion to his weight and smoking habit. (Id.)

The ALJ stated, "[c]laimant's obesity exacerbates his condition, but does not render him disabled." (Tr. 18.)  The ALJ recognized that Plaintiff's hip impairment might have been disabling as of April 2008, but after replacement surgery it would be expected to improve in less than one year.  (<u>Id.</u>)  In rejecting Dr. Butcher's opinion of disability, the ALJ noted that Dr. Butcher did not place restrictions on Plaintiff.  (<u>Id.</u>)

Although the ALJ's analysis of the effect of obesity on Plaintiff's impairments is minimal, the Court finds it is supported by the record.  There is nothing in the record that suggests Plaintiff's obesity combined with his hypertension and COPD limited Plaintiff to less than a light residual functional capacity.  Plaintiff seldom sought evaluation or treatment for shortness of breath with physical activities, his focus was on pain.  Plaintiff did not report experiencing shortness of breath while performing exertional activities during the NovaCare physical performance evaluation in 2004.  (Tr. 259-63.)  In  a preoperative assessment in February 2008, however, Plaintiff was found to have moderate obstructive pulmonary disease.  (Tr. 724.)  At the hearing, Plaintiff did not testify that shortness of breath was a reason he could not work.  (Tr. 24-49.)

Dr. Rudd acknowledged that Plaintiff's obesity and deconditioning contributed to his back impairments.  However, Dr. Rudd did not place any exertional restrictions on Plaintiff.  Instead, he stated that he would be more concerned about Plaintiff's condition from being sedentary and unemployed than he would be of any further injury Plaintiff might do to himself by working.  In other words, Plaintiff's obesity contributed to his impairments, but according to Dr. Rudd, Plaintiff's impairments did not preclude work activity.  True, Plaintiff's right hip deteriorated to the point of needing replacement, and he may have been

unable to perform light work at that time, but Dr. Butcher suggested that Plaintiff's inability to ambulate effectively after surgery would be limited to several months.  The Court finds the ALJ's analysis of obesity is supported by the record.

### b.   Credibility

Plaintiff asserts the ALJ did not explain how he arrived at an RFC for light work or why the ALJ rejected Plaintiff's testimony concerning his pain and limitations.  Plaintiff contends the ALJ improperly discounted his credibility because he is overweight and smokes and drinks too much, and the regulations do not preclude disability for smokers, obese people or people whose alcoholism is not a contributing factor material to disability.

Defendant responds that the ALJ reasonably discounted Plaintiff's subjective complaints based on the overall record.  Defendant cites the following evidence in support of the assertion that the record is inconsistent with Plaintiff's subjective complaints.  Plaintiff was neurologically intact, with full motor strength in his extremities and normal range of motion.  Plaintiff did housework and walked his dog.  Conservative treatment improved Plaintiff's condition to the point where he contemplated returning to work full-time.  Plaintiff only took non-prescription medication, and often no pain medication at all.  Defendant suggests the ALJ afforded some weight to Plaintiff's subjective complaints because he did not adopt the state agency physicians' opinions for a medium exertional RFC but reduced Plaintiff to a light RFC.  Finally, Defendant asserts the ALJ did not deny Plaintiff's claim because of his smoking and drinking habits.

When determining the credibility of a claimant's subjective complaints, the ALJ must consider "all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:  1.  the claimant's daily activities; 2.  the duration, frequency, and intensity of pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness, and side effects of medication; 5. functional restrictions." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. §§ 404.1529(c), 416.929(c); Social Security Ruling ("SSR") 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996).  The ALJ must consider each factor, but does not have to discuss each factor in the decision.  Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (citing Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004)).

Under the heading for the RFC finding in the ALJ's decision, the ALJ listed evidence in the record where physicians encouraged Plaintiff to stop smoking, improve his diet and evidence that Plaintiff drank daily or regularly.  Plaintiff testified his physicians told him to cut back on drinking. (Tr. 46.)  An ALJ can discount subjective complaints when a claimant is noncompliant with a doctor's instructions.  See Wildman v. Astrue, 596 F.3d 959, 968-69 (8th Cir. 2010) (affirming ALJ's credibility analysis where record supported the ALJ's determinations that claimant had a sporadic work history and that she was noncompliant with doctor's instructions to take her medications, follow her diet, and totally abstain from drugs and alcohol.")

Under the same heading of the ALJ's RFC finding, the ALJ listed a number of tests or examinations performed on Plaintiff that were negative, such as an EMG of the right leg, inflammatory arthritis screening, and motor, sensory and range of motion testing.  (Tr. 17.)

The ALJ considered Dr. Butcher's opinion of disability but discounted it because Dr. Butcher never placed any work restrictions on Plaintiff during the course of treatment.  (Tr. 17.)  Significantly, the ALJ noted that on May 16, 2007, about one year before Plaintiff scheduled hip replacement surgery, Plaintiff reported recently working a whole day without pain and swelling, and he was walking fifteen minutes daily.  (Tr. 17.)

There is other evidence in the record indicating that Plaintiff's daily activities were inconsistent with his subjective complaints of inability to perform full-time light exertional work.  Plaintiff was able to perform light work activities in a work evaluation at NovaCare Rehabilitation in January 2004, and his inability to complete a full day of work could be explained by his self-limiting behaviors that were noted by the evaluator.  (Tr. 259-63.)  In January 2007, Dr. Rudd stated, "I am more concerned by the risk of his sedentary lifestyle/unemployment than any risk incurred in the course of return to work."  (Tr. 670.)  Soon thereafter, the treatment notes indicate Plaintiff doing the following activities: climbing a ladder to clean the tops of cupboards (Tr. 566); doing maintenance  at Minnesota Program Development, Inc. (Tr. 573); working a six hour day (Tr. 578); working in (and falling out of) the bucket of a Bobcat (Tr. 705); and contemplating return to full-time employment (Tr. 583-84.)  For these reasons, there is substantial evidence in the record to support the ALJ's credibility determination.

## III.    CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT:**

32

1.     Plaintiff's Motion for Summary Judgment [Docket No. 7] be **DENIED**

2.     Defendant's Motion for Summary Judgment [Docket No. 13] be **GRANTED;**

3.     If this Report and Recommendation is adopted, that judgment be entered accordingly.


Dated: November 18, 2011        s/ Arthur J. Boylan

ARTHUR J. BOYLAN
United States Chief Magistrate Judge


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before December 2, 2011.